**REPORT OF MARK A. DAYMAN,
CPA/ABV/CFF, ABAR, CVA**

**SPENCER FRANCHISE SERVICES OF GEORGIA, INC.
v.
WOW CAFÉ AND WINGERY FRANCHISING ACCOUNT LLC**

**EASTERN LOUISIANA US DISTRICT COURT CIVIL ACTION 13-4688**

**FEBRUARY 4, 2016**

*This Report is the property of CapVal-American Business Appraisers, LLC. Any user, whether specifically authorized or not, of this report, any part thereof, or the information contained herein agrees that by such use it is a party to and bound by the terms of the engagement letter dated October 22, 2013 pursuant to which this report was prepared.*

**ELECTRONIC COPY WAS EMAILED SOLELY TO
BEAU SHRABLE, ATTORNEY FOR THE PLAINTIFF, AT bts@shrablepc.com.**



EXHIBIT
3

REPORT OF MARK A. DAYMAN,
CPA/ABV/CFF, ABAR, CVA

SPENCER FRANCHISE SERVICES OF GEORGIA, INC.
v.
WOW CAFÉ AND WINGERY FRANCHISING ACCOUNT LLC

EASTERN LOUISIANA US DISTRICT COURT CIVIL ACTION 13-4688

FEBRUARY 4, 2016

# I N D E X

| Section | | Page |
|---|---|---|
| A | Expert's Certification | 6 |
| B. | Qualifications | 7 |
| C | Background & Objectives | 9 |
| D | Contract Terms | 9 |
| E | Typical Area Development Agreement | 13 |
| F | Critique of SFSG's ADA Agreement with WOW | 15 |
| G | Potential Stores – Factors Considered and Assumptions | 16 |
| H | Narrowing the Search – Key Metrics | 17 |
| I | Possible Georgia Markets & Stores | 21 |
| J | Possible South Carolina Markets & Stores | 24 |
| K | Rate of Development | 25 |
| L | Assumptions Concerning Franchising Capacity | 25 |
| M | Estimated Range of Franchises Sold & Stores Opening & Closing | 27 |
| N | Mark Dayman's CV | 33 |
| O | 5-Year Case History | 38 |

# CapVal-American Business Appraisers, LLC

**3525 Piedmont Rd   BLDG 7 STE 300   Atlanta, GA 30305**
**E: mdayman@capval-llc.com      EIN 27-1866919**

February 4, 2016

Beau Shrable                              BY EMAIL: bts@shrablepc.com

Shrable PC

345 W. Broad Ave STE 306

Albany, GA 31701

Re:     Spencer Franchise Services of Georgia, Inc. v. WOW Café & Wingery Franchising
        Account LLC, Eastern Louisiana US District Court Civil Action No. 13-4688

Dear Beau:

Your client, Eddie Spencer, engaged us to study specific issues discussed below with respect to
the US District Court ("the Court") claim of Spencer Franchise Services of Georgia, Inc.
("SFSG", "the Company", "the developer", "plaintiff", "you") v. WOW Café & Wingery
Franchising Account LLC ("WOW", "defendant"), and to prepare a report describing our
investigations, analyses, and conclusions.

You and Eddie Spencer asked us to consider three matters:

1.  Are the general terms and condition contained in the Area Development Agreement dated
    June 19, 2007 ("the ADA") between SFSG and WOW, as amended by the
    contemporaneous Addendum to Area Development Agreement dated June 19, 2007
    ("AADA") (collectively "the Agreements"), common in franchising and specifically in
    fast casual and casual dining?

2.  What are the possible markets for WOW stores in Georgia and South Carolina?

3.  What is the possible range of WOW franchises that could have been sold, and the range of stores that could have been opened and closed under the Agreements but for the alleged breach of the Agreements?

***I previously issued a report related to SFSG's claim dated December 16, 2013 Except for Sections L & M Which Are Dated April 25, 2014. My current report supersedes the previous report and my opinion contained therein.***

My opinion concerning the general terms and condition contained in Agreements is set forth in Section F of this report.

In my opinion, based on the analyses and investigations set forth in this report, and subject to various assumptions and limiting conditions contained herein, the number of franchises that could have been sold by WOW, and WOW stores that could have opened and closed, in Georgia and South Carolina over the term of the Agreements, fall within the following ranges:

**Spencer Franchise Services of Georgia, Inc.**
**Summary of Estimated Franchises Sold by WOW &**
**Stores Opened & Closed Over the Term of the Agreements**
**As of February 4, 2016**

|  | Scenario | | |
|---|---|---|---|
|  | Best | Medium | Low |
| **State of Georgia 2008-2027:** | | | |
| Franchises sold | 61 | 50 | 45 |
| Traditional WOW stores opened | 59 | 45 | 38 |
| Traditional WOW stores closed | (6) | (6) | (8) |
| **Traditional WOW stores open at end of initial term of Agreements** | **53** | **39** | **30** |
| **State of South Carolina 2016-2035:** | | | |
| Franchises sold | 21 | 21 | 21 |
| Traditional WOW stores opened | 20 | 19 | 17 |
| Traditional WOW stores closed | (2) | (3) | (4) |
| **Traditional WOW stores open at end of initial term of Agreements** | **18** | **16** | **13** |

Mark A. Dayman, CPA/ABV/CFF, ABAR, CVA
Atlanta, Georgia

This report is the property of CapVal-American Business Appraisers LLC
Atlanta, Georgia 30305

## A.  Expert's Certification

I certify to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- I have no present or prospective interest in WOW or SFSG, and I have no personal interest with respect to the parties involved.

- I have no bias with respect to the matter at trial that is the subject of this report or to the parties involved with this engagement.

- My engagement in this assignment was not contingent upon developing or reporting predetermined results.

- My standard billing rate for this engagement is $300 per hour.  The total amount paid by SFSG to CapVal-American Business Appraisers LLC from the date of engagement inception to February 4, 2016 amounts to $58,488, and as of that date no accounts receivable exist for SFSG, and the approximate net amount unbilled equals $1,000.

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined conclusion that favors the cause of the client, the attainment of stipulated results, or the occurrence of a subsequent event directly related to the intended use of this report.

- With the exception of my staff that worked with me on this engagement, no persons provided significant assistance to the person signing this certification.

_(signature)_

---

**Mark A. Dayman, CPA/ABV/CFF, ABAR, CVA**
**Atlanta, Georgia**
**February 4, 2016**


## B. Qualifications

My CV is attached as Section N.  A current case list is attached as Section O.

My key experience in food and beverage and franchising includes the following:

a.  I was the head of the Real Estate and Hospitality Group at Smith Batchelder & Rugg, a large New England CPA firm from 1976 through 1989, and a partner of that firm.  My clients included hotels, resorts, food & beverage operations, and recreation outlets (primarily ski operations).  My primary services included developmental services, profit and value enhancement, and M&A activities.  Certain clients were franchisees.

b.  I was a partner of Urbach Kahn & Werlin from 1989 through 1990 with a focus in the real estate and hospitality industry. My primary services included developmental services, and profit and value enhancement.  Certain clients were franchisees.

c.  I was the managing shareholder of Dayman, Lurie & Goldsbury PC from 1990-2000.  My focus was the real estate and hospitality industry. My primary services included

developmental services, profit and value enhancement, and M&A activities. Certain clients were franchisees.

d.  I was a Senior VP and CFO of US Franchise Systems, Inc., a Georgia based hotel franchisor owned by Global Hyatt Corporation, from 2000-2006.  USFS franchised Hawthorn Suites, Microtel Inn & Suites, Best Inns, and AmeriSuites.

e.  I formed CapVal LLC in 2005, joining with Jim Lurie (who was a partner of mine in Dayman, Lurie & Goldsbury PC noted above) to form a valuation, litigation support, and capital formation firm with offices initially in Atlanta and Raleigh, and later also in Wilmington.  Financial services to the hotel, resort, and food & beverage industry continued.  Substantial services were performed for franchisors and franchisees.  The CapVal LLC was succeeded by CapVal-American Business Appraisers LLC.  I am the Managing Member of CV-ABA.

f.  Since 2006 I have been a Managing Director of The McLean Group LLC, a mid-market investment bank with headquarters in McLean, VA.  I operate the Atlanta office of TMG. I am a member of TMG's Franchise Capital Markets group.  I hold Series 62, 63 and 79 FINRA licenses.

g.  I am a partner along with Dave McDougall in FranIntel.  The Company was created in 2008 to provide specific services to franchisors and multi-unit franchisees – developmental, repositioning, turn around, capital planning, and franchise infrastructure planning.  In some cases we have acted as temporary C-level executives of companies we are advising.

h.  I am a past-Board Member of the Southeast Franchise Forum, a regional sister organization to the International Franchise Association (my term expired on December 31, 2013).

I am not an attorney. I do not provide legal services. My services in this engagement are not intended to interpret any statute or case law in general or franchise law in particular, to the extent that these may relate to the claims presented in this case.

## C.  Background & Objective

SFSG and WOW entered into an Area Development Agreement dated June 19, 2007 and at the same time executed an Addendum to Area Development Agreement.   Critical terms of the Agreements are set forth in Section D.

SFSG filed a claim against WOW in March 2013 claiming various breaches of the Agreements by WOW, and seeks damages.  WOW filed a counterclaim.

WOW is a food and beverage ("F&B") franchise system.  The brand offers a wide range of food on its menus (although chicken wings are provided, many other food types are available) using four prototypes – full table service casual dining with full bar facilities, mobile, kiosk, and QSR. The brand has approximately 75 stores open, but 68 are "non-traditional" – that is, located in captive institutional markets such as schools[1].  The brand has only 7 stores in traditional markets. I am not sure how many traditional stores existed at the time the parties entered into the Agreements, although I understand WOW had a franchisee in Rome, GA at the time.   In any event, this concept would be considered an early stage and emerging brand within the traditional market.

## D.  Contract Terms

Critical terms of the Agreements include the following:

---

[1] From the WOW website.  See www.wowcafe.com.

1. AOP ("Area of Protection") - The Agreements provide SFSG with the exclusive right to open WOW stores in Georgia with the exclusion of Clark and Oconee counties (Athens, GA (University of Georgia) area) (ADA Section 1.1).

2. The AOP specifically excludes all "non-traditional locations", including "university or college campuses, airports, and military bases" (ADA 1.5).

3. SFSG paid WOW a non-refundable ADA fee of $175,000 (ADA Section 2.1).

4. SFSG has a right of first refusal to purchase the development rights for South Carolina (AADA Item (3)).

5. As compensation for its services, SFSG is to receive "1.65% of all weekly operating fees" (as distinguished from "weekly gross sales" in ADA Section 2.3), and half of initial franchise fees and transfer fees paid by franchisees (ADA Section 2.5).

6. Franchisees located in the AOP also pay two marketing fees.  A 1% national marketing fee is retained by WOW.  An additional 1% regional marketing fee "is to be managed by" SFSG, an undefined phrase found at ADA Section 2.3.

7. When SFSG desires to open a new franchise location, WOW will provide SFSG with "the then-current standard form of franchise agreement, together with any disclosure or other documents required by law" (ADA Section 3.22).

8. The term of the ADA is 20 years, with options for SFSG to extend the ADA for up to 20 additional years (ADA Section 4.1).  SFSG is required to open two stores "on its own behalf" by September 2006 (ADA Section 4.2).  The Franchisor is also required to "sell or cause some third party to sell the number of Franchise Units set forth on the Minimum Development Requirements" (ADA Section 4.2).

A copy of the Minimum Development Requirements, which is Schedule 2 of the ADA, is presented below at Exhibit D-1.

## EXHIBIT D-1
## SPENCER FRANCHISE SERVICES OF GEORGIA, INC.
## COPY OF ADA SCHEDULE 2 – DEVELOPMENT SCHEDULE
## FEBRUARY 4, 2016

Case 2:13-cv-04688-CJB-JCW   Document 1-1   Filed 05/31/13   Page 23 of 25
Case 5:12-cv-00470-MTT   Document 1-2   Filed 11/26/12   Page 23 of 25

*Schedule 1*

OPTION AREAS DESCRIPTION

The Option Areas referred to in the Area Development Agreement are described as follows:

| State | County |
|-------|--------|
| GEORGIA | ALL COUNTIES EXCEPT OCONEE AND CLARKE |

Initials _____

Schedule 2

MINIMUM DEVELOPMENT REQUIREMENTS

| YEAR | MINIMUM DEVELOPMENT |
|------|---------------------|
| 1 | 2 |
| 2 | 2 |
| 3 | 3 |
| 4 | 4 |
| 5 | 4 |
| 6 | 4 |
| 7 | 4 |
| 8 | 4 |
| 9 | 4 |
| 10 | 4 |
| 11 | 4 |
| 12 | 2 |
| 13 | 2 |
| 14 | 1 |
| 15 | 1 |
| 16 | 0 |
| 17 | 0 |
| 18 | 0 |
| 19 | 0 |
| 20 | 0 |

TOTAL OF FORTY-FIVE (45) STORES

23

This report is the property of CapVal-American Business Appraisers LLC
Atlanta, Georgia 30305

9. In addition to WOW's obligation to sell 43 additional franchisee locations (I am assuming that two of the required 45 will be those of opened and operated by SFSG), WOW is required to support SFSG in its duties to provide site selection and construction management to new franchisees (ADA Section 5.1).

10. In ADA Section 5.2.6 WOW requires SFSG to "be responsible for all obligations of Franchisor under the current Franchise Agreement". (See ADA Sections 5.2.2-5.2.6.) SFSG is generally required to provide common field service support to franchisees, including assistance with site selection and construction, initial and on-going training, operational guidance, local advertising management and execution, and quality inspections. ADA Section 5.2.1 (d) also shifts the burden for maintaining franchise regulatory compliance in Georgia to SFSG, including SFSG's indemnification of WOW for any violations or defects in compliance.

As an observation, neither party is obligated to have 45 stores open and operating at the end of 20 years as a result of the Agreements. The Agreements require the franchisor to "develop" the market (in franchising parlance, this means to "sell" franchises), although nothing prevents SFSG from franchising new locations for its own account, or assisting with franchise development on its own or in concert with the franchisor. SFSG is required to direct, with the franchisor's help, assistance to new franchisees in the AOP as necessary to aid in site planning, build-out, opening, training, and operations. Since the base term of the franchise agreements is 10 years, it's entirely possible that some, maybe many, of the stores will close between the 10th and 20th year of the franchise agreements. It is also possible that some executed franchise agreements will never result in an open store. It does not appear to be an event of default for SFSG to act sufficiently and reasonably as a developer under the terms of the Agreements, but fail to open stores for a host of common reasons, or to have stores close prematurely, or to have franchisees elect not to extend the franchise agreement after the initial term.

## E.  Typical Area Development Agreement

Typical area development agreements ("typical ADA") are tailored to serve the interests of both the franchisor and area developer.  For the franchisor, the typical ADA:

- Enables a younger brand to more quickly build-out new territories by shifting the burden of development and management to a third party.

- Reduces the franchisor's expansion capital requirements for additional company stores to seed areas, marketing, franchisor sales, franchise management, field service, and development of scalable operating platforms.

- Builds the perception of brand mass, even if stores are not open yet, making further franchise development easier.

- Grants the franchisor the ability to limit the time and area of protection and the have ability to terminate the agreement if developer performance falls short.  The franchisor wants the stores open quickly to drive revenue and profits through franchise fees and royalties.  When the developer fails to act, the franchisor wants to quickly find another way to build out the territory by taking action itself, or finding another developer.

For the area developer, the typical ADA:

- Enables the developer to control the brand in the AOP for his or her own use or for franchise development.

- Is driven by profit motives, including sharing in franchise fees and future royalties on third party franchisees added within the AOP.

- Allows the developer to develop the brand within the AOP with limited capital commitment from the developer.

- Realizes economies of scale through streamlined operations, reduced operating costs, and increased profits and value.

Although a typical ADA is created based on the negotiated demands of each party, typical terms include the following:

a. The AOP could be large, such as an entire state. But in many cases the area is more limited, such as an MSA, or one or more counties.

b. The number of stores committed to open is normally 7-10.

c. The term is generally limited to 5-10 years.

d. The developer pays an up front, non-refundable fee in consideration for the agreement.

e. The developer may receive a significant portion of the franchise fee and up to half of the royalties, depending upon its continuing duties.

f. The duties of the parties will vary depending on the objectives of each. Generally the developer is responsible for:

    - Franchise development with limited assistance of the franchisor. Regardless of the level of participation, the franchisor normally retains the final approval of the franchisee. The agreement normally requires that the stores be open and operating at the expiration of the agreement.

    - Some level of site development planning and management. The franchisor normally retains final say on potential sites.

- Field support including start-up, training, on-going support and assistance, and QC.

g. The franchisor is normally responsible for regulatory compliance matters including filing FDDs, as well as the development and distribution of standards manuals. The franchise agreements are entered into between the franchisor and a new franchisee, and compliance decisions vest with the franchisor.


**F.  Critique of SFSG's Agreements with WOW**

In my opinion, the following terms of the Agreements appear unusual:

1. The 20-year term of the agreement is unusually long, especially for an emerging brand (keep in mind that WOW only has a handful of traditional locations – most stores are non-traditional). Early stage F&B franchise brands face a number of challenges over time that impact economic success and even survival. Many critical market factors can change over even a short period of time – population centers, demographics, cultures and ethnic groups change, contract and expand; and prototypes and menus may need changes. These situations can leave stores entering early in weak positions.

2. The AOP, in this case all of Georgia with limited exceptions, is a large amount of real estate. This leaves the emerging franchisor in an even more difficult position if it wants to make early changes to prototypes, concepts, markets menus, and the like.

3. The requirement to sell 45 stores over the first 15-18 years of 20 years of the agreement is an unusual demand (I have assumed the additional 3-5 years allows time for stores to be sited, built, opened, and stabilized). The scope of this agreement term is beyond the reasonably known market demands for an emerging brand. Keep in mind that the base term of the franchise agreement is only 10 years (renewals can occur) – this is not an uncommon franchise term-length in F&B, one specifically selected to provide the

franchisor or the franchisee with the opportunity to terminate a franchisee location that no longer meets the market, design, and operating standards for the brand.

4. The Agreements make *the franchisor* responsible for franchise development in the AOP. While this feature is unusual, one can understand why SFSG would want this requirement in order to offset the risks associated with an early stage given the unusual length of the contract, the size of the AOP territory, and the high number of stores committed.

5. Making SFSG responsible for regulatory compliance, which appears to include document preparation and filing, as well as responses to complaints on behalf of the franchisor, is not a practical contract term for a developer to execute. Too many features controlled and managed by the franchisor need to be incorporated into the Franchise Disclosure Document, Standards Manuals, QC and compliance, etc. While Georgia and South Carolina are "non-registration" states (FDDs are not required to be filed; no specific franchise regulatory bureaucracies exist), complaints filed – whether criminal, civil, or business complaints -- will need to be addressed by WOW.

## G. Potential Stores – Factors Considered and Assumptions

You have asked me to opine on the approximate number of traditional WOW stores that could be developed in Georgia between June 2007 and June 2027, and 2016-2035 for South Carolina.

The F&B industry, franchised or not, operates in a classic supply and demand paradigm. Successful stores are located in areas where owners believe moderate- to long-term demand is sufficient to provide a reasonable return on investment, recognizing that competitors are available, or will become available to satisfy demand as well. Satisfying demand means more than having seats available. F&B operations need to meet the unique but varying taste and entertainment desires of the eating and drinking public.

Virtually all F&B franchise systems maintain minimum location requirements for site selection. These conditions may be limited to population density. More mature brands have studied in

depth the correlation between economic and demographic factors and store success. These additional factors may include stratified population data, area employment by type, detail economic data on people in the area, demand generators in the market areas, and transportation, to name a few.

I considered the following factors and assumptions:

1.  I visited a traditional store in Rome, Georgia on December 2, 2013. I believe this was the only traditional store in Georgia at the time, and continues to be the only traditional store location in the state[2]. I also reviewed the market area characteristics that impacted that store.

2.  I assumed the current traditional "full service" store prototype will continue throughout the term of the Agreements. WOW claims to have 4 prototypes – mobile, kiosk, QSR, and full service stores ranging from 2,500-5,000SF including a full-service bar.[3]

3.  I considered store locations based only on current metrics – economic, demographic, market centers, etc. In reality over time populations will grow, population mixes will change, and market centers will often expand or contract or relocate. Estimating the future impact of all potential emerging factors is beyond the scope of this study.

4.  I assumed a stable economy throughout the initial term of the Agreements. I also assumed that the stores would satisfy all local political and zoning requirements.

5.  I relied on information on population and economics available in the public domain. I have accepted this data as complete and accurate without further verification by me.

## H.  <u>Narrowing the Search – Key Metrics</u>

We considered the population and economic requirements of competing brands. We found no similar published data on WOW, but we have been advised by SFSG's counsel that the

---

[2] Refer to http://www.wowcafe.com/locator.
[3] See http://www.wowcafe.com/concepts.php.

population requirement is 30,000 people, slightly lower than the competitors.   Exhibit H-1 sets forth data on the competitors.   When selecting competitors, we considered themes, menus, and target markets.

In addition to population density requirements, another element we considered was the number of competitors in the market, which suggests a demand for product.   While it may sound attractive to be the only casual restaurant in a market, the lack of competition more likely suggests a lack of market demand in the trade area.

I also investigated key population and economic data for the metropolitan statistical areas (MSAs) in Georgia and South Carolina.   Exhibits H-2 and H-3, respectively, show the results of our investigation.   Sources of data are disclosed in each of the Exhibits, but US Census data forms the basis for much of the economic and demographic data.

### Exhibit H-1
### Spencer Franchise Services of Georgia, Inc.
### Competitors and Development Criteria
### February 4, 2016

| Restaurant | Store Locations | | | Population Requirement | Household Income |
|---|---|---|---|---|---|
| | Total | GA | SC | | |
| Applebee's | 2,000+ | 74 | 40 | Data not disclosed | |
| Buffalo Wild Wings | 1100+ | 21 | 15 | 40,000 minimum, 80%+ between ages 20-50 | Over $30,000 median |
| Chili's | 1600+ | 46 | 17 | Not currently franchising | |
| Hooters | 335+ | 19 | 8 | 100,000 in immediate area | $50,000 |
| O'Charley's | 200+ | 27 | 11 | Data not disclosed | N/A |
| T.G.I. Friday's | 900 | 8 | 5 | 300,000 within a 14 minute drive; 3,000/sq. mile | N/A |
| Twin Peaks | 73 | 3 | 2 | 150,000 within 5 miles | $60,000, age 25-55 |
| Wingstop | 580+ | 15 | 6 | N/A | N/A |
| Wing Zone | 85+ | 5 | 2 | 40,000 residents within 3 miles; mid to young adults | Middle income earning power |
| Wild Wing Café | 40 | 13 | 13 | N/A | N/A |
| Loco's Grill and Pub | 10 | 6 | 0 | 50,000; 70% under age 54 | $50,000 or more with unemployment  below 10% |

**Source- Data obtained from competitor websites, including franchise requirements when disclosed.**

This report is the property of CapVal-American Business Appraisers LLC
Atlanta, Georgia 30305

**Exhibit H-2**
**Spencer Franchise Services of Georgia, Inc.**
**Georgia Economic & Demographic Data**
**February 4, 2016**

| Georgia MSAs | City Data (4) Inflation Adjusted 2014 $$$ | Per Capita Income (1, 4) | Median Household Income (4) | Mean Household Income (4) | Employ- ment (1) | Population 2010 Census (2) | Population 2014 (3) |
|---|---|---|---|---|---|---|---|
| Brunswick | | $ 34,194 | | | 40,499 | 112,370 | 114,806 |
| | Brunswick City Data | $ 16,700 | $26,775 | $41,568 | | | |
| Chattanooga, TN-GA | | $ 39,260 | | | 31,143 | 528,143 | 544,559 |
| | Chattanooga City Data | $ 24,134 | $ 39,683 | $ 56,896 | | | |
| Columbus, GA-AL | | $ 36,683 | | | 102,111 | 294,865 | 314,005 |
| | Columbus City Data | $ 23,209 | $ 41,362 | $ 59,695 | | | |
| Dalton | | $ 30,676 | | | 34,353 | 142,227 | 142,952 |
| | Dalton City Data | $ 20,180 | $ 35,530 | $ 55,234 | | | |
| Gainesville | | $ 35,491 | | | 79,388 | 179,684 | 190,761 |
| | Gainesville City Data | $ 19,792 | $ 39,791 | $ 56,923 | | | |
| Hinesville-Ft. Stewart | | $ 30,322 | | | 19,002 | 77,917 | 82,311 |
| | Hinesville City Data | $ 21,264 | $ 44,896 | $ 56,119 | | | |
| | Fort Stewart | $ 15,432 | $ 32,165 | $ 40,047 | | | |
| Macon (5) | | $ 36,282 | | | 96,908 | 232,293 | 230,450 |
| | Macon City Data | $ 16,860 | $ 26,545 | $ 43,104 | | | |
| Rome | | $ 33,705 | | | 38,280 | 96,317 | 96,063 |
| | Rome City Data | $ 20,041 | $ 33,787 | $ 50,940 | | | |
| Valdosta | | $ 31,975 | | | 54,079 | 139,588 | 143,317 |
| | Valdosta City Data | $ 17,769 | $ 29,828 | $ 45,326 | | | |
| Warner Robins | | $ 37,165 | | | 69,005 | 179,605 | 187,516 |
| | Warner Robins City Data | $ 20,838 | $ 44,661 | $ 53,973 | | | |
| Albany | | $ 33,692 | | | 57,972 | 157,308 | 154,925 |
| | Albany City Data | $ 17,064 | $ 28,303 | $ 43,147 | | | |
| Atlanta-Sandy Springs-Marietta | | $ 43,472 | | | 2,407,247 | 5,286,728 | 5,614,323 |
| | Atlanta City Data | $ 35,719 | $ 46,439 | $ 82,029 | | | |
| | Sandy Springs City Data | $ 50,387 | $ 63,401 | $114,463 | | | |
| | Marietta City Data | $ 24,980 | $ 42,688 | $ 62,716 | | | |
| Augusta-Richmond Co. | | $ 36,117 | | | 150,969 | 564,873 | 583,632 |
| | Augusta-Richmond Co. CDP | $ 20,553 | $ 37,593 | $ 51,585 | | | |

(1) United States Department of Labor Bureau of Labor Statistics (Per capita income for 2014 MSA available at http://www.bls.gov/oes/current/oes_sc.htm#otherlinks, Employment estimates as of Q2 2015.
(2) 2010 data available at Census: http://www.census.gov/population/www/cen2010/cph-t/CPH-T-2.pdf.
(3) Annual Estimates of the Population of Metropolitan and Metropolitan Statistical Areas: April 1, 2010 to July 1, 2014: available at http://www.census.gov/popest/data/metro/totals/2014/.
(4) Selected Economic Characteristics, 2010-2014 American Community Survey 5-Year Estimates in inflation adjusted 2014 dollars available at http://factfinder2.census.gov/faces/nav/jsf/pages/community_facts.xhtml#none.
(5) Macon City Per Capita and Household Incomes current data not available from Fact Finder Census. Used data from prior report from 2007-2011 American Community Survey 5-year Estimate.

**This report is the property of CapVal-American Business Appraisers LLC**
**Atlanta, Georgia 30305**

**Exhibit H-3**
**Spencer Franchise Services of Georgia, Inc.**
**South Carolina Economic & Demographic Data**
**February 4, 2016**

| South Carolina MSAs | City Data (4) Inflation Adjusted 2014 $ | Per Capita Income (1, 4) | Median House-hold Income (4) | Mean House-hold Income (4) | Employ-ment (1) | Population 2010 Census (2) | Population 2014(3) |
|---|---|---|---|---|---|---|---|
| Anderson (5) | | | | | 60,790 | - | - |
| | Anderson City Data | $22,081 | $41,579 | $55,713 | | | |
| Augusta-Richmond Co. | | $ 36,117 | | | 204,390 | 564,873 | 583,632 |
| | Augusta-Richmond Cons. Gov. Data | $ 20,553 | 37,593 | 51,585 | | | |
| Charleston-N. Charleston-Summerville | | $ 41,305 | | | 308,520 | 664,607 | 727,689 |
| | Charleston City Data | $ 33,117 | $ 52,971 | $ 76,855 | | | |
| | N. Charleston City Data | $ 19,820 | $ 39,446 | $ 50,977 | | | |
| | Summerville City Data | $ 25,808 | $ 55,290 | $ 67,614 | | | |
| Charlotte-Gastonia-Rock Hill | | $ 42,425 | | | 910,290 | 2,217,012 | 2,380,314 |
| | Charlotte City Data | $ 31,844 | $ 53,274 | $ 79,917 | | | |
| | Gastonia City Data | $ 21,524 | $ 39,578 | $ 55,390 | | | |
| | Rock Hill City Data | $ 22,460 | $ 40,718 | $ 55,720 | | | |
| Columbia | | $ 38,469 | | | 356,160 | 767,598 | 800,495 |
| | Columbia City Data | $ 24,723 | $ 41,454 | $ 63,690 | | | |
| Florence | | $ 35,220 | | | 81,500 | 205,566 | 207,030 |
| | Florence City Data | $ 25,420 | $ 43,007 | $ 62,349 | | | |
| Greenville-Mauldin-Easley (5) | | $ 37,333 | | | 309,340 | 824,112 | 862,463 |
| | Greenville City Data | $ 31,043 | $ 41,147 | $ 69,126 | | | |
| | Mauldin City Data | $ 26,915 | $ 56,619 | $ 67,152 | | | |
| | Easley City Data | $ 23,268 | $ 40,453 | $ 56,075 | | | |
| Myrtle Beach-N. Myrtle Beach-Conway | | $ 32,913 | | | 116,320 | 376,722 | 417,668 |
| | Myrtle Beach City Data | $ 26,949 | $ 37,064 | $ 60,722 | | | |
| | N. Myrtle Beach City Data | $ 33,753 | $ 45,780 | $ 63,332 | | | |
| | Conway City Data | $ 18,215 | $ 35,479 | $ 48,578 | | | |
| Spartanburg | | $ 35,897 | | | 126,590 | 313,268 | 321,418 |
| | Spartanburg City Data | $ 20,858 | $ 34,092 | $ 48,996 | | | |
| Sumter | | $ 36,077 | | | 33,860 | 107,456 | 107,919 |
| | Sumter City Data | $ 22,141 | $ 39,072 | $ 54,040 | | | |

(1) United States Department of Labor Bureau of Labor Statistics (Per capita income for 2014 MSA obtained here) available at http://www.bls.gov/oes/current/oes_sc.htm#otherlinks.  Employment estimates as of Q2 2015.

(2) 2010 data from Census: http://www.census.gov/population/www/cen2010/cph-t/CPH-T-2.pdf.

(3) Annual Estimates of the Population of Metropolitan and Metropolitan Statistical Areas: April 1, 2010 to July 1, 2014 available at http://www.census.gov/popest/data/metro/totals/2014/.

(4) Selected Economic Characteristics, 2010-2014 American Community Survey 5-Year Estimates in inflation adjusted 2014 dollars  available at http://factfinder2.census.gov/faces/nav/jsf/pages/community_facts.xhtml#none.

(5) Anderson MSA per capita income included in Greenville-Mauldin-Easley.  Census data includes Greenville-Mauldin-Easley.

This report is the property of CapVal-American Business Appraisers LLC
Atlanta, Georgia 30305

Keep in mind that while Exhibit H-1 describes the supply of *direct competitors*, each of the MSAs also contain a large number of *secondary competitors* too numerous to accumulate in detail: affiliated and unaffiliated emerging and legacy QSR, fast casual, and casual dining; sports bars; etc.

## I.   Possible Georgia Markets & Stores

Exhibit I-1 shows my estimate of the WOW traditional stores that could be developed in Georgia.  We considered several factors:

- The population density requirements and competitor data we accumulated in Exhibits H-1, -2, and -3.

- The secondary food and beverage competitors in the QSR, fast casual, and casual dining segments, a market supply far greater than the direct competitors.

- Awareness of market centers in the communities.   Market centers are areas where people collect for a variety of commercial reasons generally related to the depth and scope of retail trade, employment, recreation and entertainment, and transportation corridors.  In large metro areas like Atlanta, there can be dozens of market centers.  In smaller communities, there may be only one.

- Since the Atlanta MSA is such a large area, we broke the Atlanta market into two large areas – Inside the Perimeter ("ITP", areas inside I-285), and Outside the Perimeter (OTP, areas outside I-285).

- The number and location of stores is based on current data and product.  The market will change over the unusually long term of the Agreements – market centers will change, some will gradually move, some will close, others will open, and people's taste for WOW's current F&B will change.